IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-00291-07-CR-W-BCW |
| | ) | |
| WILLIAM F. PARRY, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant William F. Parry's Motion to Dismiss (doc #197). The motion contains three separate arguments for dismissal: (1) Motion to Dismiss for Lack of Jurisdiction; (2) Motion to Dismiss All Counts of the Indictment for Insufficiency; and (3) Motion to Dismiss Based on Outrageous Government Conduct. In the alternative, defendant advises that a lawsuit has been filed in New York State asserting that the state taxing mechanism as applied to Seneca territories is unconstitutional and requests that the Court stay these criminal proceedings until a decision is issued by the state court. For the reasons set forth below, it is recommended that defendant Parry's Motion to Dismiss be denied in its entirety.

I. INTRODUCTION

On August 13, 2013, defendant William F. Parry, along with seventeen others, was charged by indictment.[1] On September 10, 2013, the government was granted leave to amend

---

[1]Defendant Parry is also charged with two counts of wire fraud in Case No. 12-00307-01-CR-W-BCW. Case No. 12-00307 has been consolidated for trial with Case No. 13-00291-01/18-CR-W-BCW.

the indictment. Defendant Parry is charged in nine counts [2] of this forty-four count indictment—Count 1 (conspiracy to commit wire fraud and contraband cigarette trafficking); Counts 2, 5, 6 and 8 (trafficking in contraband cigarettes); and Counts 21, 22, 37 and 38 (wire fraud). The remaining counts of the indictment charge various other defendants with trafficking in contraband cigarettes, wire fraud and a conspiracy to launder the proceeds of trafficking in contraband cigarettes.

## II. DISCUSSION

### A. Motion to Dismiss for Lack of Jurisdiction

The Contraband Cigarette Trafficking Act ("CCTA"), the statute underlying defendant's charges in this case, provides that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes …." 18 U.S.C. § 2342(a). Contraband cigarettes are defined as "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State … cigarette taxes in the State or locality where such cigarettes are found …." 18 U.S.C. § 2341(2). The New York Tax of Cigarettes and Tobacco Products statute provides:

> 1. There is hereby imposed and shall be paid a tax on all cigarettes possessed in the state by any person for sale, except that no tax shall be imposed on cigarettes sold under such circumstances that this state is without power to impose such tax, including sales to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation …. The tax imposed by this section is imposed on all cigarettes sold on an Indian reservation to non-members of the Indian nation or tribe and to non-Indians and evidence of such tax shall be by means of an affixed cigarette tax stamp. Indian nations or tribes may elect to participate in the Indian tax exemption coupon system established in section four hundred seventy-one-e of this article which provides a mechanism for the collection of the tax imposed by this section on cigarette sales on qualified reservations to such

---

[2]While the caption of the indictment lists defendant Parry as included in Counts 9 and 10, the actual charges contained in Counts 9 and 10 do not include defendant Parry. Thus, defendant Parry is not charged in Counts 9 and 10.

2

non-members and non-Indians and for the delivery of quantities of tax-exempt cigarettes to Indian nations or tribes for the personal use and consumption of qualified members of the Indian nation or tribe. If an Indian nation or tribe does not elect to participate in the Indian tax exemption coupon system, the prior approval system shall be the mechanism for the delivery of quantities of tax-exempt cigarettes to Indian nations or tribes for the personal use and consumption of qualified members of the Indian nation or tribe as provided for in paragraph (b) of subdivision five of this section.

2. It is intended that the ultimate incidence of and liability for the tax shall be upon the consumer, and that any agent or dealer who shall pay the tax to the commissioner shall collect the tax from the purchaser or consumer. Except as hereinafter provided, the tax shall be advanced and paid by the agent. The agent shall be liable for the collection and payment of the tax on cigarettes imposed by this article and shall pay the tax to the commissioner by purchasing … adhesive stamps …. All cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation cigarette sellers located on an Indian reservation must bear a tax stamp.

N.Y. Tax Law § 471.

Defendant Parry argues that the indictment should be dismissed for lack of jurisdiction

based on the following:

5. Defendant William Parry is an enrolled member of the Seneca Nation of Indians ("SNI"), a federally recognized Indian tribe which is part of the Six Nation Iroquois Confederacy. His property, where he lives and runs his company, Wolf's Run Transport, is located on the Cattaraugus Indian Reservation, which is part of the Seneca Nation territory. …

6. As Seneca territory, specifically the Cattaraugus Reservation, is not part of New York State, the state cigarette taxing scheme, and in turn the CCTA, is inapplicable to Mr. Parry while operating on sovereign land. Accordingly, the criminal activity alleged within the indictment fails to allege a crime upon which the federal government can assert over defendant Parry and must be dismissed.

7. The [CCTA] makes it "unlawful for the person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes …" 18 U.S.C. § 2342(a).

8. "Contraband cigarettes" under the CCTA means "a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment **of applicable State cigarette taxes** in the State where such cigarettes are found, if such State

Case 4:13-cr-00291-BCW   Document 259   Filed 01/13/15   Page 3 of 26

requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes …"  18 U.S.C. § 2341(2) (emphasis added).

9.      Thus, a violation of state law is a prerequisite for violating the CCTA. …

10.      At bar, defendant Parry is charged with various CCTA violations and Wire Fraud violations stemming from the transactions utilized to allegedly violate the CCTA.

11.      Specifically, William Parry is alleged to have "transported and caused to be transported into New York State unstamped cigarettes without prior approval by the New York State Department of Taxation and Finance and without first paying the required $4.35 per pack excise tax.   PARRY would then sell those unstamped, untaxed cigarettes at Wolf's Run store."  [See Indictment, pg 14]. "PARRY would also sell those unstamped, untaxed cigarettes to other smoke shops on the reservations in New York State."  Id.

12.      Finally "[i]t was further part of the conspiracy that WILLIAM F. PARRY … would wire transfer money across state lines to prepay for orders of unstamped cigarettes."  Id. at 15.

13.      Therefore, the crimes alleged as to Mr. Parry require a jurisdictional element, that is, a violation of New York State Tax Law, § 471 et seq.  As explained below, as Mr. Parry resides and works on the Cattaraugus Reservation, not within New York State, § 471 is unconstitutional as enforced against him and therefore not applicable to his actions on the reservation.

14.      Furthermore, the CCTA itself is a statute of general applicability that cannot abrogate rights guaranteed by Indian treaties.  Accordingly, it is unconstitutional as applied to Mr. Parry.

15.      Accordingly, the indictment must be dismissed. …

(Motion to Dismiss (doc #197) at 4-6)

The core of defendant's argument is that the Cattaraugus Indian Reservation, where defendant lives and runs his business, is not part of New York State pursuant to Indian treaties[3]

---

[3]Defendant cites the 1831 Treaty with the Senecas as stating:  "The United States guarantee that said lands shall never be within the bounds of any State or Territory, nor subject to the laws thereof …."  (Motion to Dismiss (doc #197) at 13)   Defendant argues that the Treaties of 1838 and 1842

4

and, therefore, state statutes, in particular the state cigarette taxing scheme, are inapplicable to him. Defendant has provided no case law to compel this conclusion and the Court has found none in its research. Instead, the Court's research would suggest the opposite result was recognized long ago. In United States ex rel. Pierce v. Waldow, 294 F. 111 (W.D.N.Y. 1923), a habeas corpus proceeding where an Indian was restrained of his liberty by state process, the court found:

> The paramount question, after all, is whether the Seneca Indians, remnants of the once powerful Six Nations, residing on the Cattaraugus reservation, are in fact, as they claim, outside of the geographical limits of the sovereignty of New York. There are numerous decisions in the courts of this state wherein the right of occupancy and possession and legal status of the Seneca Indians are ably and exhaustively discussed. In all of them it has been unequivocally held that … the sovereignty of the state of New York attaches to their lands comprised within its boundaries, Seneca Nation of Indians v. Christie, 126 N.Y. 122, 27 N.E. 275 …. That both the federal and state governments at various times in the past made treaties with the Indians is unquestionable, though the paramount authority of the federal government over them is generally conceded, but the government has frequently recognized the right of the state to deal with Indians within its boundary.

> In Benson v. U.S. (C.C.) 44 Fed. 178, Judge Wallace, in speaking of the right of this state to exercise sovereignty over tribal Indians, said that since 1858 New York has always exercised its sovereign powers within the reservation, and that in New York v. Dibble, 21 How. 366, 16 L.Ed. 149, the Supreme Court of the United States decided that it has a right so to do, 'so far as necessary to protect the property and persons of Indians in this state and to preserve the public peace.'

> The Seneca Nation of Indians in 1848, in a convention at the Council House on the Cattaraugus reservation, adopted a Constitution, wherein they … acknowledged that their then existing civil conditions failed to answer the purpose for which all governments should be created …. They invoked the government of the United States and the state of New York to aid them in providing laws under which the existing evils growing out of their tribal system might be eliminated, and in their charter their chiefs or council were authorized to make laws not inconsistent with the Constitution of the United States or of the state of New York. The Legislature, acting upon their request, in March, 1849, assented, and from then on at different times numerous laws for their civil government and regulation of their internal affairs were passed. …

Waldow, 294 F. at 114-15 (footnote omitted). In United States ex rel. Kennedy v. Tyler, 269 U.S.

reaffirm the retained sovereign status of the Seneca land. (Id. at 13-15)

13 (1925), the Supreme Court noted the following from the <u>Waldow</u> decision:

> [T]hat court pointed out that as early as 1849 the state of New York, at the earnest request of the Indians themselves, had assumed jurisdiction over them and their lands and possessions within the state; that to that end state laws had been enacted for their civil government and the regulation of their internal affairs; that the peacemakers' courts on the several reservations were created by state law; and that the courts of the state had uniformly held that the power of the state in respect of these matters had never been doubted or questioned, and such sovereignty as the Indians may have formerly possessed had been merged and lost in the sovereignty of the state, under which they must look for protection of life and property. …

<u>Id.</u> at 16. Further, the Court notes that the official Seneca Nation of Indians website acknowledges that Seneca nation members are citizens of the state in which they reside. See www.sni.org/faq.

Defendant Parry argues that the treaties listed above and New York Indian Law § 6[4] require a finding that the State of New York cannot tax cigarettes which are sold to non-Indians on an Indian reservation. Courts, however, have found to the contrary. In <u>New York State Department of Taxation & Finance v. Bramhall</u>, 235 A.D.2d 75, 667 N.Y.S.2d 141 (N.Y. App. Div. 1997), the court responded to a similar argument:

> Seneca Hawk and Triple J's contend that the State cannot tax transactions occurring on the reservations of the Seneca Nation because the Nation, having never been conquered by the United States, is sovereign and beyond the reach of State law. Those contentions lack merit. The immunity from taxation that respondents claim here is not conferred by Federal treaties (<u>see</u>, 7 US Stat 15, 33, 44, 586) or by case law interpreting those treaties (<u>see</u>, <u>New York Indians</u>, 72 U.S. 761; <u>Snyder v. Wetzler</u>, 193 A.D.2d 329, <u>affd.</u> 84 N.Y.2d 941; <u>Fellows v. Denniston</u>, 23 N.Y. 420). The 1784, 1789 and 1794 Treaties (7 U.S. Stat. 15, 33, 44) do not confer any immunity from taxation, and the 1842 Treaty (7 U.S. Stat. 586), although it prohibits the State from taxing reservation land, does not bar the imposition of excise and sales taxes on cigarettes and motor fuel sold to

---

[4]Defendant Parry also cites further support from Indian Law § 71. (<u>See</u> Motion to Dismiss (doc #197) at 10) Section 71 deals with parts of the Allegany reservation included in the villages of Vandalia, Carrollton, Great Valley, Salamanca, West Salamanca and Red House. As defendant Parry has advised that his property, where he lives and runs his company, is located on the Cattaraugus Indian Reservation, the Court does not find Indian Law § 71 applicable.

Case 4:13-cr-00291-BCW   Document 259   Filed 01/13/15   Page 6 of 26

non-Indians on the Seneca Nation's reservations (see, Snyder v. Wetzler, supra, 193 A.D.2d, at 331). Indian Law § 6 and 25 U.S.C. § 233 similarly bar only the imposition of a tax on reservation land (Snyder v. Wetzler, supra, 193 A.D.2d, at 332-333).

Further, the sovereign rights of the Seneca Nation do not prohibit application of the State's tax laws to sales on the Seneca Nation's reservations to non-Indians. "'[E]ven on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law'" (Rice v. Rehner, 463 U.S. 713, 718, quoting Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148). State taxation of sales of cigarettes and other products to non-Indians on reservations and other taxes directed toward the activity of non-Indians on reservations have been sustained notwithstanding Indian claims of sovereignty (see, Department of Taxation & Fin. v. Milhelm Attea & Bros., [512 U.S. 61 (1994)]; Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163; Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, reh. denied 448 U.S. 911; Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463). ...

Tax Law § 283(1) provides that only a registered distributor may import motor fuel or cause such fuel to be imported "into the state, for use, distribution, storage or sale within the state." Seneca Hawk contends that, because the Seneca Nation is a sovereign nation and its reservations are not part of New York State, the seized motor fuel was not destined for use, distribution, storage or sale "within the state." That contention was implicitly rejected by this Court in (Matter of 1750 Cases of Liquor, 231 A.D.2d 947, affg. 166 Misc.2d 739), a case involving a challenge to the seizure of liquor pursuant to tax laws with statutory language analogous to that in section 283(1). We conclude that the contention, insofar as it relates to Tax Law § 283(1), also lacks merit ….

Bramhall, 235 A.D.2d at 85-86. See also United States v. Kaid, 241 Fed. Appx. 747, 750 (2d Cir. 2007)("Both the [1842 Treaty with the Seneca] and [New York Indian Law § 6] clearly prohibit only the taxation of real property, not chattels like cigarettes."); City of New York v. Wolfpack Tobacco, No. 13 Civ. 1889(DLC), 2013 WL 5312542, at *5 (S.D.N.Y. Sept. 9, 2013)("New York Indian Law § 6 ("Exemption of reservation lands from taxation") … applies only to taxes on real estate.")

While case law is clear that federal law prohibits New York from taxing cigarette sales to

enrolled tribal members on their own reservations for personal use, case law is equally clear that

New York may tax on-reservation cigarette sales to persons other than reservation Indians. <u>See</u>

<u>Oneida Nation of New York v. Cuomo</u>, 645 F.3d 154, 158 (2d Cir. 2011).  As set forth in <u>Cuomo</u>:

> "The Constitution vests the Federal Government with exclusive authority over relations with Indian Tribes." <u>Montana v. Blackfeet Tribe of Indians</u>, 471 U.S. 759, 764 (1985)(citing U.S. Const. art. I, § 8, cl.3).  "As a corollary of this authority, and in recognition of the sovereignty retained by Indian tribes …, Indian tribes and individuals generally are exempt from state taxation within their own territory." <u>Id.</u>  Consequently, absent Congressional authorization, "[s]tates are categorically barred from placing the legal incidence of an excise tax *on a tribe or on tribal members* for sales made *inside Indian country*." <u>Wagnon v. Prairie Band Potawatomi Nation</u>, 546 U.S. 95, 101-02 (2005)(internal quotation marks and citation omitted).

> The situation is different, however, when a state seeks to tax non-members who engage in economic transactions on Indian reservations. <u>See Olka. Tax Comm'n v. Chickasaw Nation</u>, 515 U.S. 450, 459 (1995).  Here, courts must subject a state tax scheme over on-reservation, non-member activities to "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." <u>White Mountain Apache Tribe v. Bracker</u>, 448 U.S. 136, 145 (1980).  Eschewing "mechanical or absolute conceptions of state or tribal sovereignty," this interests-balancing analysis instead "determine[s] whether, in the specific context, the exercise of state authority would violate federal law." <u>Id.</u>

> In the context of cigarette sales, the balancing of state and tribal interests is informed by two judgments that are well-established in the caselaw.  First, non-Indian purchasers are consistently willing and able to evade state cigarette taxes by purchasing their cigarettes from reservation retailers. <u>Cf.</u> <u>Washington v. Confederated Tribes of Colville Indian Reservation</u>, 447 U.S. 134, 145 (1980).  Second, the revenue tribes and retailers gain from cigarette sales to non-members derives from the marketing of a tax exemption, not from value "generated on the reservations by activities in which the [t]ribes have a significant interest." <u>Id.</u> at 155.

> In recognition of the foregoing, the Supreme Court has stated that "principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, [do not] authorize Indian tribes ... to market an exemption from state taxation to persons who would normally do their business elsewhere." <u>Id.</u> at 155.  That is so because "[s]tates have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes'

8

modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere." Department of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc., 512 U.S. 61, 73 (1994). A state's interest in ensuring the collection of taxes on cigarette sales to non-Indians continues to outweigh a tribe's countervailing interests even when collection of an excise tax "seriously disadvantages or eliminates the Indian retailer's [cigarette] business with non-Indians." Colville, 447 U.S. at 151.

*  *  *

In light of this balance of interests, the Supreme Court has determined that to enforce valid state taxation of on-reservation cigarette sales, states may impose "on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians." Milhelm Attea, 512 U.S. at 73.

Cuomo, 645 F.3d 15 165-66.

Finally, the law is settled that Indians are not exempt from the CCTA. See Grey Poplars Inc. v. 1,371,100 Assorted Brands of Cigarettes, 282 F.3d 1175, 1177 (9th Cir. 2002)("the CCTA is a federal statute of general applicability and it applies equally to Indians, even on the reservation, as it does to others"); United States v. Baker, 63 F.3d 1478, 1483 n.1 (9th Cir. 1995)("we hold Indians are not exempt from the CCTA"); United States v. 1,920,000 Cigarettes, No. 02-CV-437A, 2003 WL 21730528 (W.D.N.Y. Mar. 31, 2003)(in seizure action for cigarettes destined for delivery to the Ojibwas Trading Post located on the Cattaraugus Indian Reservation, Seneca Nation of Indians, the court found claimants' argument that the CCTA is not a statute of general applicability because it does not specifically state that it applies to Native Americans to be without merit). As set forth in City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966 (CBA), 2011 WL 6945758, at *1 (E.D.N.Y. Dec. 30, 2011), New York Tax Law § 471 has been found to serve as the basis for claims under the CCTA with regards to cigarettes sold from a reservation to non-tribe members of the public.

Contrary to defendant Parry's arguments, the New York state cigarette taxing scheme, and

in turn the CCTA, are applicable to defendant on the Cattaraugus Indian Reservation. Accordingly, the criminal activity alleged within the indictment alleges a crime upon which the federal government can assert over defendant Parry. The Court sees no need to stay these proceedings to wait for a ruling from the New York state courts on the constitutionality of the cigarette taxing scheme. Courts have repeatedly upheld state cigarette taxing schemes on Indian reservations in New York and other states. Defendant's motion to dismiss for lack of jurisdiction must be denied.

B.    Motion to Dismiss All Counts of the Indictment for Insufficiency

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be informed of the nature and cause of the accusation …." This Constitutional requirement is implemented by Rule 7(c)(1) of the Federal Rules of Criminal Procedure which specifies that "[t]he indictment ... must be a plain, concise, and definite written statement of the essential facts constituting the offense charged …." An indictment is sufficient if it:   (1) contains the essential elements of the offenses charged; (2) fairly informs the defendant of the charges against which he must defend; and (3) enables the defendant to plead an acquittal or conviction in bar of future prosecution for the same offenses.   See Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. O'Hagan, 139 F.3d 641, 651 (8th Cir. 1998); United States v. Wessels, 12 F.3d 746, 750 (8th Cir. 1993), cert. denied, 513 U.S. 831 (1994).   The sufficiency of a criminal indictment is determined from its face.   There is no summary judgment procedure in criminal cases nor do the rules provide for a pre-trial determination of the sufficiency of the evidence.   See United States v. Nabors, 45 F.3d 238, 240 (8th Cir. 1995); United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992).   Indictments are normally sufficient unless no reasonable

10

construction can be said to charge the offense.   See O'Hagan, 139 F.3d at 651; United States v. Fleming, 8 F.3d 1264, 1265 (8th Cir. 1993).

As set forth above, defendant Parry is charged in nine counts of the forty-four count indictment—Count 1 (conspiracy to commit wire fraud and contraband cigarette trafficking); Counts 2, 5, 6 and 8 (trafficking in contraband cigarettes); and Counts 21, 22, 37 and 38 (wire fraud).   The indictment provides in part:

## COUNT ONE

From on or about July 2010, and continuing until on or about January 26, 2012, said dates being approximate, in the Western District of Missouri and elsewhere, [all defendants] did knowingly and intentionally combine, conspire, confederate and agree with others both known and unknown, to commit offenses against the United States, that is, wire fraud, in violation of Title 18, United States Code, Section 1343; contraband cigarette trafficking, in violation of Title 18, United States Code, Sections 2341 through 2346.

### Background and General Allegations

\* \* \*

7.      During all times relevant to this conspiracy, WILLIAM F. PARRY owned and operated Wolf's Run, located in Irving, New York, a business that, among other things, operated a gas station, convenience store, and trucking transport business.   Neither WILLIAM F. PARRY nor Wolf's Run was a licensed New York tobacco wholesaler authorized to bring cigarettes into New York State. SALVATORE TORNABENE was a driver for WILLIAM F. PARRY.

\* \* \*

### Manner and Means

23.      It was part of the conspiracy that UCC 1 [unindicted co-conspirator 1], CRAIG SHEFFLER, and TADAIYON would make regular purchases in Kansas City, Missouri, of contraband cigarettes from undercover agents (UCAs) of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in exchange for U.S. currency.

24.      It was part of the conspiracy that T. CAMERON JONES and DAVID BISHOP would coordinate the orders between UCC 1, CRAIG

SHEFFLER and TADAIYON. TADAIYON and GERALD E. BARBER would coordinate the cigarette orders from the vendors in New York State – including WILLIAM F. PARRY, TARA SUNDOWN, AJ's and HCID in Nebraska.

25.     WILLIAM F. PARRY, TARA SUNDOWN, AJ's and Keith Stoldt transported and caused to be transported into New York State unstamped cigarettes without prior approval by the New York Department of Taxation and Finance and without first paying the required $4.35 per pack excise tax. PARRY would then sell those unstamped, untaxed cigarettes at Wolf's Run store. SUNDOWN would then sell those unstamped, untaxed cigarettes at Jan's Smoke shop. AJ's and PARRY would also sell those unstamped, untaxed cigarettes to other smoke shops on the reservations in New York State. Stoldt would then sell those unstamped, untaxed cigarettes at his Totem Pole Smoke Shop.

26.     It was further a part of the conspiracy that WILLIAM F. PARRY, TARA SUNDOWN, AJ's and Keith Stoldt would wire transfer money across state lines to prepay for orders of unstamped cigarettes. At the time of those wire transfers, WILLIAM F. PARRY, TARA SUNDOWN, AJ's and Keith Stoldt knew they were purchasing unstamped cigarettes with the intent that the New York State excise tax would not be pre-collected, thus allowing the sale of the cigarettes at a considerable discount and depriving New York State of its tax revenue.

27.     WILLIAM F. PARRY, TARA SUNDOWN, AJ's and Keith Stoldt would place the order for unstamped cigarettes through PHILIP CHRIST and GERALD E. BARBER. BARBER, using SCTC, would then place orders for those unstamped cigarettes from TADAIYON and BNC. TADAIYON would forward the order to DAVID BISHOP, and DAVID BISHOP would e-mail the order for the unstamped cigarettes to SHEFFLER and CTW in Independence, Missouri.

28.     After the orders had been placed, through the end of September 22, 2011, TADAIYON, MARK BISHOP and PIOTR HOFFMANN would pick-up the unstamped cigarettes in the Kansas City, Missouri area and transport them to the SCTC in Grove, Oklahoma. From SCTC, the unstamped cigarettes would be transported to Wolf's Run, Jan's Smoke Shop, AJ's and the Totem Pole Smoke Shop in New York State by Wolf's Run or a common carrier.

*   *   *

30.     At no point during the conspiracy timeframe was the New York State excise tax paid on these cigarette transactions. From the post-*Oneida* date, June, 2011, through the end of the conspiracy, the total state excise tax lost to New York State was approximately $8,148,420.

## Overt Acts

31.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Western District of Missouri and elsewhere:

\*   \*   \*

(e)     On or about April 15, 2011, UCC 1 and TADAIYON purchased contraband cigarettes from the ATF undercover operation in Kansas City, Missouri;

\*   \*   \*

(2)     On April 15, 2011, SALVATORE TORNABENE picked up the 12,780 cartons of Marlboro cigarettes from the ATF undercover warehouse in Kansas City, Missouri.   SALVATORE TORNABENE informed the ATF undercover agents that his boss, WILLIAM F. PARRY, had done nine or ten other deals with TADAIYON.

\*   \*   \*

(g)     On May 26, 2011, UCC 1 paid the ATF undercover agent $453,650 in cash and a $280,000 check for 23,400 cartons of Marlboro cigarettes and 9,000 cartons of other contraband cigarettes.   MARK BISHOP picked up the 12,800 cartons of Marlboro cigarettes at the ATF undercover warehouse in Kansas City, Missouri.   The contraband cigarettes were delivered to AJ's and Wolf's Run in New York State.

\*   \*   \*

(k)     On August 4, 2011, CRAIG SHEFFLER paid the ATF undercover agent $541,725 in cash for 132 cases (7,920 cartons) of Marlboro cigarettes, and other cigarettes.   The following acts were taken by the co-conspirators in this transaction:

\*   \*   \*

(7)     The contraband cigarettes were transported from Oklahoma to Totem Pole Smoke Shop in New York State by Wolf's Run Transport, the company owned by WILLIAM F. PARRY.   PARRY was paid $7,950 by BNC for transportation fees.

13

\*  \*  \*

(m)     On September 15, 2011, CRAIG SHEFFLER purchased 15,480 cartons (258 cases) of untaxed Marlboro cigarettes and 5,760 (96 cases) cartons of untaxed Newport cigarettes from the ATF undercover agents for $613,080.   CRAIG SHEFFLER paid $490,000 of this amount in cash.   The following acts were taken by the co-conspirators in this transaction:

\*  \*  \*

(5)     On September 15, 2011, the following wire transfers took place in order to complete the sale of the contraband cigarettes:

\*  \*  \*

(B)     Wolf's Run transferred $235,080 to the SCTC;

\*  \*  \*

(7)     On September 16, 2011, TADAIYON and HOFFMANN drove with the contraband cigarettes from Independence, Missouri, to Grove, Oklahoma.   The truck was stopped by the Missouri Highway Patrol near Neosho, Missouri. The driver was PIOTR HOFFMANN who provided a bill of lading to the trooper which identified the cigarettes as coming from BNC corporation, 23208 E. US 24 Highway, Independence, Missouri, to SCTC in Grove, Oklahoma.   The bill of lading also listed the carrier as being Wolf's Run Transport;

(8)     On September 19, 2011, TORNABENE was stopped by Missouri Highway Patrol troopers near Springfield, Missouri, in the Penske rental truck.   The driver, TORNABENE, originally told the trooper that the cigarettes were coming from an Indian Reservation and were being delivered to an Indian Reservation.   TORNABENE then told the trooper that cigarettes were coming from and going to a tobacco wholesaler. TORNABENE then told an ATF agent that he had flown to Oklahoma City to [pick up] the cigarettes from the Seneca Cayuga Indian Reservation, in Grove, Oklahoma, and was driving them to Virginia.   The ATF agent called Juma brothers in Virginia and confirmed with MOUSA JUMA that the cigarettes were being delivered to his business.

14

\*　\*　\*

(o)     October 13, 2011, SHEFFLER paid the ATF undercover agent $638,240 in currency and a $10,000 check for 354 cases of contraband cigarettes.    The following acts were taken by the co-conspirators in this transaction:

\*　\*　\*

(5)     HOFFMANN drove the Penske truck containing the contraband cigarettes to the Holiday Inn express in North Kansas City, Missouri.    In the hotel parking lot, HOFFMANN exchanged vehicles with WILLIAM F. PARRY.    ATF agents followed PARRY with the load of cigarettes from Kansas City, Missouri, to Terre Haute, Indiana.    Agents in Buffalo, New York, observed the same Penske truck arrive early the following morning at Wolf's Run in Irving, New York;

\*　\*　\*

(v)     On December 16, 2011, PARRY purchased 110 cases of untaxed Marlboro cigarettes and 30 cases of untaxed Newport cigarettes from ATF undercover agents for $265,800 in cash.    The transaction took place in Irving, New York.

\*　\*　\*

(y)     None of the co-conspirators reported the sales of the unstamped cigarettes listed above to New York State, as required by law.

(z)     None of the co-conspirators obtained prior approval from the New York Department of Taxation and Finance for the transportation of the above-listed cigarettes into New York State, as required by law.

(aa)     None of the co-conspirators prepaid the New York State excise tax on the unstamped cigarettes listed above, as required by law.

All in violation of Title 18, United States Code, Section 371.

## CONTRABAND CIGARETTE TRAFFICKING ACT

## COUNT TWO

On or about August 4, 2011, in the Western District Missouri and elsewhere, the defendants GHOLAMREZA "REZA" TADAIYON, MARK

BISHOP, and WILLIAM F. PARRY, aided and abetted by CRIAG SHEFFLER, DAVID BISHOP, T. CAMERON JONES, and GERALD E. BARBER, did knowingly ship, transport, receive, possess, sell, distribute, and purchase in excess of 10,000 contraband cigarettes, as defined in Title 18, United States Code, Section 2341:

| Count | Date | Defendants/ Drivers | Cartons of Cigarettes | Delivered from Kansas City, Missouri to: |
|---|---|---|---|---|
| 2 | [8/4/11] | MARK BISHOP, TADAIYON, & PARRY | 7,920 | Oklahoma & New York |

All in violation of Title 18, United States Code, Sections 2342(a), 2344(a) and 2.

\* \* \*

## COUNT FIVE

On or about [September 19, 2011], in the Western District Missouri and elsewhere, the defendant SALVATORE TORNABENE, aided and abetted by CRAIG SHEFFLER, DAVID BISHOP, T. CAMERON JONES, GERALD E. BARBER, MOUSA JUMA, and WILLIAM F. PARRY, did knowingly ship, transport, receive, possess, sell, distribute, and purchase in excess of 10,000 contraband cigarettes, as defined in Title 18, United States Code, Section 2341:

| Count | Date | Defendants/ Drivers | Cartons of Cigarettes | Delivered from Kansas City, Missouri to: |
|---|---|---|---|---|
| 5 | [9/19/11] | TORNABENE | 8,280 | Oklahoma & Virginia |

All in violation of Title 18, United States Code, Sections 2342(a), 2344(a) and 2.

## COUNT SIX

On or about [September 21, 2011], in the Western District Missouri and elsewhere, the defendants WILLIAM F. PARRY, aided and abetted by CRAIG SHEFFLER, DAVID BISHOP, T. CAMERON JONES, GERALD E. BARBER, and TARA SHUNDOWN did knowingly ship, transport, receive, possess, sell, distribute, and purchase in excess of 10,000 contraband cigarettes, as defined in

16

Title 18, United States Code, Section 2341:

| Count | Date | Defendants/ Drivers | Cartons of Cigarettes | Delivered from Kansas City, Missouri to: |
|-------|------|---------------------|----------------------|------------------------------------------|
| 6 | [9/21/11] | PARRY | 9,180 | New York |

All in violation of Title 18, United States Code, Sections 2342(a), 2344(a) and 2.

\* \* \*

## COUNT EIGHT

On or about October 13, 2011, in the Western District Missouri and elsewhere, the defendants GHOLAMREZA "REZA" TADAIYON, MARK BISHOP, WILLIAM F. PARRY and PIOTR HOFFMANN, aided and abetted by CRAIG SHEFFLER, DAVID BISHOP, T. CAMERON JONES, and TEDDY FRENCHMAN, did knowingly ship, transport, receive, possess, sell, distribute, and purchase in excess of 10,000 contraband cigarettes, as defined in Title 18, United States Code, Section 2341:

| Count | Date | Defendants/ Drivers | Cartons of Cigarettes | Delivered from Kansas City, Missouri to: |
|-------|------|---------------------|----------------------|------------------------------------------|
| 8 | [10/13/11] | HOFFMANN, PARRY, MARK BISHOP, & TADAIYON | 18,180 | Nebraska & New York |

All in violation of Title 18, United States Code, Sections 2342(a), 2344(a) and 2.

\* \* \*

## WIRE FRAUD

1.      The allegations contained in Count One are hereby realleged and incorporated by reference as though set forth in full.

2.      On or about the dates set forth below, and [sic] the Western District Missouri, the defendants named below, did knowingly, intentionally, and unlawfully devise, execute and attempt to execute a scheme and artifice to defraud the State of New York, and to obtain money by means of false and fraudulent

17

pretenses, representations, or promises, did transmit or cause to be transmitted in interstate or foreign commerce cigarette orders and other communications, by means of … a wire communication, certain signs, signals, pictures or sounds, for the purpose of executing a scheme or artifice:

| Count | Date | Wire transmission from and to: | Defendants |
|---|---|---|---|
| 21 | 09/14/11 | E-mail from D. Bishop in Canada to SHEFFLER in Missouri (rev. invoice requested) | CRAIG SHEFFLER, DAVID BISHOP, JONES, TADAIYON, BARBER, PARRY, and SUNDOWN |
| 22 | 09/14/11 | E-mail from SHEFFLER in Missouri to D. Bishop in Canada and JONES in Washington (rev. invoice) | CRAIG SHEFFLER, DAVID BISHOP, JONES, TADAIYON, BARBER, PARRY, and SUNDOWN |
| 37 | 12/08/11 | Telephone call from ATF U/C in Missouri to WILLIAM PARRY in New York | WILLIAM F. PARRY |
| 38 | 12/12/11 | Telephone call between WILLIAM F. PARRY in New York and ATF U/C in Missouri | WILLIAM F. PARRY |

All in violation of Title 18, United States Code, Sections 1343 and 2.

(Doc #62)

1.    Counts 2, 5, 6 and 8

Counts 2, 5, 6 and 8, the charges brought against defendant Parry for trafficking in contraband cigarettes, charge a violation of 18 U.S.C. § 2342(a), the CCTA.   18 U.S.C. § 2342(a) states that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes …."   In City of New York v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966 (CBA), 2011 WL 6945758, at *3 (E.D.N.Y. Dec. 30, 2011), the court set forth the elements for a CCTA violation as follows:

18

… that a party (1) knowingly "ship, transport, receive, possess, sell, distribute or purchase" (2) more than 10,000 cigarettes (3) that do not bear tax stamps, (4) under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps.

Defendant Parry contends that Counts 2, 5 and 6 must be dismissed because the overt acts set forth in Count 1, which would relate to each of these counts, do not allege defendant Parry's knowledge of the alleged contraband nature of the cigarette shipments. (Motion to Dismiss (doc #197) at 22-23) Further, defendant Parry contends that Count 2 does not allege that he was the driver of the vehicle transporting the cigarettes.[5] (Id. at 22) Finally, defendant Parry contends that Counts 5, 6 and 8 must be dismissed because the requisite element of state tax liability is not present because no New York State tax was due on the cigarettes until after they left the reservation and entered the stream of commerce within New York State. (Id. at 23-24)

"An indictment which 'tracks the statutory language' is ordinarily sufficient." United States v. Tebeau, 713 F.3d 955, 962 (8th Cir. 2013)(quoting United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008)). Counts 2, 5, 6 and 8 track the appropriate statutory language. Each of these counts states that defendant Parry acted "knowingly." Whether the government will introduce sufficient evidence to prove defendant Parry's knowledge of the alleged contraband nature of the cigarette shipments cannot be resolved prior to the government's presentation of its case to the jury.

Defendant's claim that the requisite element of state tax liability is not present because no New York State tax was due must also fail. As set forth above, the New York state cigarette taxing scheme is applicable to defendant on the Cattaraugus Indian Reservation. Under New York Tax Law § 471, taxes should have been paid and tax stamps affixed to the cigarettes prior to

---

[5]Count Two clearly lists defendant Parry as a "Defendant/Driver."

their delivery to the reservation.[6]   Counts 5, 6 and 8 each state that "in excess of 10,000 contraband cigarettes" were involved.   This language tracks the statutory language of the CCTA. The indictment is sufficient.

> 2.   Counts 21, 22, 37 and 38

Counts 21, 22, 37 and 38, the charges brought against defendant Parry for wire fraud, charge a violation of 18 U.S.C. § 1343.   18 U.S.C. § 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned … or both. …

In United States v. Rice, 699 F.3d 1043 (8th Cir. 2012), the court set forth the elements for a wire fraud violation as follows:

> The government must prove each essential element of wire fraud to establish the defendant's guilt:   (1) intent to defraud, (2) participation in a scheme to defraud, and (3) the use of a wire in furtherance of the fraudulent scheme.

Id. at 1047.

Defendant Parry contends that Counts 21, 22, 37 and 38 must be dismissed because they fail to allege that defendant Parry possessed an intent to defraud.   (Motion to Dismiss (doc #197) at 25-26)   Further, defendant Parry contends that the government has failed to plead any knowledge on behalf of defendant Parry that the cigarettes were untaxed in Counts 21, 22, 37 and 38.   (Id.)   Finally, defendant Parry contends that no tax was due and owing to New York

---

[6]While there is a system in place whereby cigarettes sold to qualified Indians for their own use and consumption on their nations' or tribes' qualified reservation are exempt from taxation, as set forth in the allegations of the indictment, this system was not utilized here.   See Government's Opposition to Defendant William F. Parry's Motion to Dismiss (doc #211) at 2 through 4 for an overview of this system.

State at the time Parry allegedly took possession of the cigarettes as the cigarettes were on sovereign land not within New York State.   (Id. at 26)

Again, "[a]n indictment which 'tracks the statutory language' is ordinarily sufficient." United States v. Tebeau, 713 F.3d 955, 962 (8th Cir. 2013)(quoting United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008)).   Counts 21, 22, 37 and 38 track the statutory language of 18 U.S.C. § 1343.   These counts charge:

> … the defendants … did knowingly, intentionally, and unlawfully devise, execute and attempt to execute a scheme and artifice to defraud the State of New York, and to obtain money by means of false and fraudulent pretenses, representations, or promises, did transmit or cause to be transmitted in interstate or foreign commerce cigarette orders and other communications, by means of … a wire communication, certain signs, signals, pictures or sounds, for the purpose of executing a scheme or artifice ….

(Doc #62 at 43)

Contrary to defendant's argument, each of these counts states that defendant Parry knowingly, intentionally and unlawfully executed and attempted to execute a scheme to defraud the State of New York.   Defendant's argument that the government has failed to plead any knowledge on behalf of defendant Parry that the cigarettes were untaxed must also fail.   The Manner and Means section of Count One of the indictment, which is incorporated into the wire fraud counts, states:

> 25.    WILLIAM F. PARRY … transported and caused to be transported into New York State unstamped cigarettes without prior approval by the New York Department of Taxation and Finance and without first paying the required $4.35 per pack excise tax.   PARRY would then sell those unstamped, untaxed cigarettes at Wolf's Run store. … PARRY would also sell those unstamped, untaxed cigarettes to other smoke shops on the reservations in New York State. …

> 26.    It was further a part of the conspiracy that WILLIAM F. PARRY, … would wire transfer money across state lines to prepay for orders of unstamped cigarettes.   At the time of those wire transfers, WILLIAM F. PARRY … knew

21

[he was] purchasing unstamped cigarettes with the intent that the New York State excise tax would not be pre-collected, thus allowing the sale of the cigarettes at a considerable discount and depriving New York State of its tax revenue.

(Doc #62 at 14-15)

Again, defendant's claim that no tax was due and owing to New York State at the time Parry allegedly took possession of the cigarettes as the cigarettes were on sovereign land not within New York State must fail.  As set forth above, the New York state cigarette taxing scheme is applicable to defendant on the Cattaraugus Indian Reservation.  The indictment is sufficient.

       3.    <u>Count 1</u>

Defendant Parry argues:  "[a]s each and every substantive count with regard to Mr. Parry is insufficient, it follows that the conspiracy count must be dismissed."  (Motion to Dismiss (doc #197) at 27)

The Court notes that the alleged conspiracy is a crime separate from any of the alleged substantive charges brought against defendant Parry.  In any event, contrary to defendant's argument, the Court finds each of the substantive counts brought against defendant Parry, as well as the conspiracy count, to be sufficient.

       C.    <u>Motion to Dismiss Based on Outrageous Government Conduct</u>

The Supreme Court has left open the possibility that in some situations the government's conduct might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  <u>United States v. Russell</u>, 411 U.S. 423, 431-32 (1973).  However, "'[t]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court.'"  <u>United</u>

Case 4:13-cr-00291-BCW   Document 259   Filed 01/13/15   Page 22 of 26

States v. Jensen, 69 F.3d 906, 910 (8th Cir. 1995)(quoting United States v. Pardue, 983 F.2d 843,

847 (8th Cir. 1993)).   The Eighth Circuit Court of Appeals has stated the following with respect to

dismissing a case for outrageous government conduct:

> ... the rule that outrageous government conduct can foreclose criminal charges has been applied by our court almost exclusively to situations involving entrapment, where law enforcement officers have sought to create crimes in order to lure a defendant into illegal activity that she was not otherwise ready and willing to commit.

United States v. Boone, 437 F.3d 829, 842 (8th Cir.), cert. denied, 549 U.S. 870 (2006)(internal

quotations omitted).

Defendant Parry argues that this Court's conscience should be shocked for the following

reasons:

> 114.    The agent's actions in driving the alleged contraband cigarettes to Mr. Parry's place of business and then essentially placing them in his possession and later indicting him for CCTA violations all with the knowledge that Mr. Parry was a Seneca operating on sovereign territory certainly meets the requirement of outrageous conduct by the government. …

> 115.    At bar, there was simply no evidence that Mr. Parry engaged in this transaction with the intent to violate the CCTA laws, as he has always maintained that his territory is sovereign and not within New York State, as recognized by the state's own Indian Laws, codified with the principles of the Seneca treaties.

> * * *

> 118.    The only arguable evidence at the time that Mr. Parry was predisposed to engage in alleged contraband cigarette trafficking was the October 13, 2011 transport of alleged contraband cigarettes from Missouri to Mr. Parry's property on the Cattaraugus reservation.

> 119.    That did not, however, rise to the level of predisposition, as it was never determined that at the time whether Mr. Parry took possession of the truck that it (a) contained contraband cigarettes; or (b) that Mr. Parry believed them to be contraband. …

> 120.    This is further supported by the fact that Mr. Parry had a legitimate

23

belief that cigarettes possessed on his territory were not required to be affixed with tax stamps. Finally, this transaction was initiated by the agents [on December 8, 2011], as was the delivery to Mr. Parry on his property. …

      121.     Accordingly, the agent's actions in establishing and conducting this undercover operation for over two years[7] which resulted in arguably millions of contraband cigarettes entering the stream of commerce; contacting Mr. Parry and offering to deliver cigarettes to his sovereign property and then indicting him for alleged CCTA and wire fraud violations, rise to the level of actions "offensive to traditional notions of fundamental fairness" so as to violate Due Process and warrant dismissal of the indictment as to Mr. Parry. …

(Motion to Dismiss (doc #197) at 29-31)

Contrary to defendant's argument, the Court has found the New York state cigarette taxing scheme is applicable to defendant on the Cattaraugus Indian Reservation. To the extent that defendant Parry is arguing that this case should be dismissed because he was entrapped, the Court notes that entrapment is an affirmative defense generally left to the jury. See United States v. Coleman, 284 F.3d 892, 894 (8th Cir.), cert. denied, 537 U.S. 935 (2002). Nevertheless, there are two elements to an entrapment defense: (1) government inducement of the crime; and (2) the defendant's lack of predisposition to engage in the criminal conduct. See United States v. Abumayyaleh, 530 F.3d 641, 646 (8th Cir. 2008); United States v. Roberts, 174 Fed. Appx. 475, 479 (11th Cir. 2006). The Roberts court found that evidence of the government's mere suggestion of a crime or initiation of contact is not sufficient to show government inducement. Id. The evidence before this Court suggests that defendant Parry was shipping, transporting, receiving, possessing, selling, distributing or purchasing cigarettes that

---

[7]As set forth in United States v. Hasan, 846 F.Supp.2d 541, 548 (E.D. Va. 2012)("Federal investigations into large-scale criminal enterprises frequently take several years to complete, and courts have accordingly rejected claims of outrageous government conduct in cases involving undercover operations lasting even longer than the one involved here [which took approximately two years].")

did not bear tax stamps both before[8] any contact with undercover ATF agents in the investigation that resulted in the current indictment and after[9] he had been advised through a civil forfeiture suit in the Western District of Missouri that such conduct was allegedly illegal.   Case law is clear that it is not outrageous conduct for the government to infiltrate an ongoing operation for the purpose of closing it down and prosecuting the operators.   See United States v. Paktipatt, 168 F.3d 503, 1999 WL 90561, at *2-3 (9th Cir. Feb. 19, 1999).

The Court finds the ATF investigation and operation, as described by defendant Parry in him motion, neither outrageous nor shocking.   The government's conduct provides no basis for dismissal of the charges against defendant Parry.   In the alternative, defendant Parry requested a hearing to develop the actions of the government with regard to the undercover operation.   This request is also denied as defendant Parry has set forth nothing in his motion to suggest any improper conduct on the part of the government.

### III.   CONCLUSION

For the foregoing reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and

---

[8]The indictment alleges that on April 15, 2011, Gholamreza Tadaiyon purchased contraband cigarettes from the ATF undercover operation in Kansas City, Missouri.   (Doc #62 at ¶ 31(e)) Salvatore Tornabene, a driver for defendant Parry, picked up the cigarettes from the ATF undercover warehouse in Kansas City, Missouri.   (Id. at ¶ 31(e)(2))   Tornabene informed the ATF undercover agents that his boss, defendant Parry, had done nine or ten other deals with Tadaiyon.   (Id.)   Tadaiyon owned and operated Brand Name Connoisseurs, Corp., (BNC) a business located in Florida.   (Id. at ¶ 2)   Neither Tadaiyon nor BNC was a licensed New York tobacco wholesaler authorized to bring cigarettes into the State of New York.   (Id.)
[9]The Notice of Complaint for Forfeiture to William Parry is dated July 3, 2012.   (See Case No. 12-00745-CV-W-SOW at doc #26)   The indictment in United States v. William F. Parry, No. 12-00307-01-CR-W-BCW, alleges that on July 26, 2012, defendant Parry contacted the undercover ATF agent via telephone and informed the agent that he (Parry) needed to get more product, referring to unstamped cigarettes.   These cigarettes were delivered on September 26, 2012.   (Doc #3 at ¶¶ 6, 7 and 14 in Case No. 12-00307)

Case 4:13-cr-00291-BCW   Document 259   Filed 01/13/15   Page 25 of 26

applicable law, enter an order denying defendant Parry's Motion to Dismiss (doc #197).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same.   A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

_____ /s/ Sarah W. Hays _____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE

Case 4:13-cr-00291-BCW   Document 259   Filed 01/13/15   Page 26 of 26