IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
v.                                  )        Case No. 13-00291-07-CR-W-BCW
                                    )
WILLIAM F. PARRY,                   )
                                    )
            Defendant.              )


REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant William F. Parry's Motion to

Suppress (doc #198). For the reasons set forth below, it is recommended that this motion be

denied.


I. INTRODUCTION

On August 13, 2013, defendant William F. Parry, along with seventeen others, was

charged by indictment.[1] On September 10, 2013, the government was granted leave to amend

the indictment. Defendant Parry is charged in nine counts[2] of this forty-four count indictment—

Count 1 (conspiracy to commit wire fraud and contraband cigarette trafficking); Counts 2, 5, 6

and 8 (trafficking in contraband cigarettes); and Counts 21, 22, 37 and 38 (wire fraud). The

remaining counts of the indictment charge various other defendants with trafficking in

contraband cigarettes, wire fraud and a conspiracy to launder the proceeds of trafficking in

---

[1]Defendant Parry is also charged with two counts of wire fraud in Case No. 12-00307-01-CR-W-BCW. Case No. 12-00307 has been consolidated for trial with Case No. 13-00291-01/18-CR-W-BCW.
[2]While the caption of the indictment lists defendant Parry as included in Counts 9 and 10, the actual charges contained in Counts 9 and 10 do not include defendant Parry.

contraband cigarettes.

While defendant Parry has requested a hearing if the Court is not inclined to suppress all evidence and fruits of the search based on his written motion, it does not appear that an evidentiary hearing is necessary as defendant is challenging only the probable cause for and scope of the search warrant. "In reviewing the validity of a search warrant, a court is limited to the information and circumstances contained within the four corners of the underlying affidavit." United States v. Stanert, 762 F.2d 775, 778 (9th Cir. 1985). The motion will, therefore, be ruled based on the "information and circumstances contained within the four corners of the underlying affidavit."

## II.  THE AFFIDAVIT

The Affidavit, given in support of a search warrant for Wolf's Run, 1412 Route 438, Irving, New York 14081 (also known as 12795 4 Mile Level Road) provides in part:

> 11.     I believe, based on my knowledge of this investigation, that Craig SHEFFLER, through CTW, coordinated the contraband cigarette transactions described herein.  Based on experience and knowledge of this investigation, I believe that PARRY, through Wolf's Run, facilitated the transportation of these contraband cigarettes in coordination with CTW in order to bring these contraband cigarettes into New York State.  As a result of this coordination, PARRY has participated in a conspiracy that includes money laundering, mail and wire fraud, and violations of the CCTA.  This affidavit summarizes some of the acts done in furtherance of that conspiracy.  Further, I believe, based on my knowledge of this investigation, that PARRY committed and attempted to commit wire fraud by setting up a September 26, 2012, transaction for stolen, unstamped cigarettes.  The affidavit also summarizes that incident.

> *  *  *

> 25.     States, excluding North Carolina, South Carolina and North Dakota, require cigarettes purchased for resale to a have a tax stamp to be sold to a retail outlet.  Cigarettes transferred to other wholesalers, both within and outside the state, must also be reported to the Department of Revenue of the licensee selling the cigarettes and by the wholesaler receiving the product.  The total amounts of cigarettes reported to the state include both stamped and unstamped

2

cigarettes. A wholesaler must also have a license for each state for which they are stamping.

26. As part of this regulatory scheme, New York State Department of Taxation and Finance (NYDTF) pre-collects an excise tax of $4.35/pack and sales tax of $0.61/pack from wholesalers for sales to Indian nations and tribes as a result of Chapter 134 of the Laws of 2010. New York State provides Indian nations and tribes with two options: 1) use a tax-exempt coupon system with coupons issued by the state, or 2) wholesalers must receive prior approval from NYDTF to make tax-exempt sales to Indian nations or tribes. This law was challenged by multiple Indian nations in both federal and state courts, all ending in rulings favorable to New York State. One of those cases includes *Oneida Nation of New York v. Cuomo*, 645 F.3d 154 (2d Cir. 2011), decided on May 9, 2011. In this decision, the Second Circuit Court of Appeals held that the plaintiffs (multiple Indian nations and tribes) failed to demonstrate that New York State's system imposed an unnecessary economic burden and interfered with their rights of self-government. On or about June 21, 2011, the NYDTF implemented the coupon and prior-approval system and announced as such on their website. On July 15, 2011, New York Government Andrew M. Cuomo announced the results of the new cigarette tax enforcement efforts.

27. In regards to this case, ATF undercover agent (UC) Wes Williamson sold unstamped contraband cigarettes directly to William PARRY in New York State. PARRY has not reported to New York State as purchasing cigarettes from UC Williamson or anyone else.

\*  \*  \*

30. William PARRY is the sole proprietor of Wolf's Run, which is actually made up of two entities, Wolf's Run Transport and Wolf's Run Car Wash, both of which are operated out of the same address of 1412 Route 438, Irving New York 14081 (also known as 12795 4 Mile Level Road). Both are collectively referred to as Wolf's Run throughout this affidavit. The actual property consists of several structures, including the above-mentioned warehouse with attached/adjoining residence and a convenience store. According to the New York State Department of Taxation and Finance, William PARRY and/or Wolf's Run has never registered or licensed as a Wholesale Dealer of Cigarettes, a Distributor of Tobacco Products or as a Wholesale Dealer of Tobacco Products in New York. Therefore, according to the CCTA, PARRY and/or Wolf's Run cannot possess or receive in excess of 10,000 cigarettes.

<u>HISTORICAL INVESTIGATION</u>

31. In December 2009, ATF agents initiated an investigation into the illegal sales of contraband cigarettes occurring in Kansas City, Missouri.

3

Investigators developed information that James Aboud and Craig SHEFFLER supplied convenience stores in the Kansas City Metropolitan Area with cigarettes through Cheap Tobacco Wholesale (CTW).

32.     From August 2010 through January 2012, UC Williamson and other undercover ATF special agents acting as … unlicensed wholesalers conducted over 65 undercover cigarette transactions with targets of the investigation.   The majority of these transactions were arranged between UC Williamson and CTW.  The subjects engaged in these transactions and schemes in order to avoid the accurate reporting of cigarettes for tax-evasion purposes, which include New York State.  The following contains summaries of these transactions involving contraband cigarettes sold by ATF undercover agents to CTW and other subjects which relate to PARRY and/or other drivers transporting contraband cigarettes for Wolf's Run on PARRY's behalf.

<u>The following describes an April 14-15, 2011, transaction.</u>

33.     On April 15, 2011, ATF UCs sold a total of 127,800 packs (213 cases) to Aboud which were then sold to Gholamreza "Reza" TADAIYON.  The following events occurred in relation to this transaction:

        A.      On April 14, 2011, TADAIYON arrived at the ATF UC warehouse (located in Kansas City, Missouri) in a Penske rental truck with Salvatore Tornabene, who is an employee of PARRY and Wolf's Run.  While waiting for wire transfers to pay for the cigarettes, TADAIYON attached labels to each pallet of cigarettes and loaded the cigarettes in the Penske truck.   These labels indicated that the cigarettes were going to three locations:  1) AJs Wholesale, 12587 Route 438, Irving, NY; 2) Arrowhawk Smoke Shop, 852 Bloomingdale Rd, Basom, NY; and 3) Totem Pole, 1031 Ledge Rd, Basom, NY.  All of these are on Indian Country ….

        B.      TADAIYON stated that he makes the bill of lading and a shipping letter for each shipment.  TADAIYON discussed how he uses the cover of the Indian tribes to transport cigarettes and other products that Wolf's Run ships.  TADAIYON showed SA Williamson a piece of paper with the name of William PARRY.   TADAIYON and Tornabene identified PARRY as the owner of Wolf's Run.

        C.      Tornabene claimed that they rented the Penske truck under the sovereign nation, which made the truck part of the sovereign nation and prevented anyone but the federal authorities from searching the truck.  The truck was set for drop off in Angola, New York, which is near the Cattaraugus Reservation and PARRY's business, Wolf's Run.  Due to a

4

delay of the wire transfer, the cigarettes did not depart the ATF UC warehouse until April 15, 2011.

      D.      On April 15, 2011, Tornabene told UC Williamson that this was the ninth or tenth deal that his boss (PARRY) had done with TADAIYON. Tornabene said that [in] the other deals PARRY was the recipient of the cigarettes but on this transaction, PARRY was only part of the transportation. SA Williamson and Tornabene discussed selling cigarettes directly to PARRY. Tornabene stated that he had just spoke[n] with PARRY about buying the load. Tornabene stated that PARRY was trying to get the money into an account in the event that PARRY needed to purchase the load.

*  *  *

<u>The following describes a June 23, 2011, transaction.</u>

34.     On June 23, 2011, UC Williamson and UC Lester sold a total of 246,000 packs (410 cases) of contraband cigarettes to CTW. Piotr HOFFMANN, a driver later associated with TADAIYON, was present during the transaction and obtained 75,600 packs (126 cases) from CTW. The following events occurred in relation to this transaction:

      A.      During this transaction, TADAIYON used Juma Brothers as a proxy to purchase the cigarettes from CTW, which CTW bought from UC Williamson. HOFFMANN carried documents which showed that the cigarettes were being sold to "Jume Bros. in Portsmouth, Virginia." Hoffmann also had a set of printed directions to Virginia which included a map. Your affiant believes that these documents would be provided to law enforcement in the event of a traffic stop.

      B.      HOFFMANN was driving a Penske rental truck. This truck was rented in Kansas City under the name of Wolf's Run out of Irving, New York. The truck was set for drop off in Angola, New York, which is near the Cattaraugus Reservation and PARRY's business.

*  *  *

<u>The following describes a July 14, 2011, transaction.</u>

35.     On July 14, 2011, ATF UC agents sold a total of 253,500 packs (422.5 cases) of contraband cigarettes to CTW. Mark BISHOP, a driver for TADAIYON, was present during the transaction and obtained 79,200 packs (132 cases) from CTW. The following events occurred in relation to this transaction:

A.     This is the first transaction that occurred after two key events.  The first is that IRS-CI and FBI executed a search warrant of Juma Brothers in Chesapeake, VA.  Second, New York State began aggressively enforcing the prepayment of excise and sales taxes on the sales of cigarettes to Indian nations and tribes within New York State. These events appear to have influenced the method of delivery the conspirators chose.  This is evidenced by the fact that Juma Brothers was eliminated as a proxy for TADAIYON and that the cigarettes were delivered to HO-Chunk, Inc. (HCI) in Nebraska after being purchased from ATF UC agents and CTW.

B.     Mark BISHOP arrived for this transaction in a U-Haul truck which had been rented on July 14, 2011, in the Kansas City area under the name of Wolf's Run. …

*  *  *

D.     Based on the analysis of records, your affiant believes that subjects of the investigation conspired amongst themselves and others to broker, facilitate, promote, and conceal the sale of contraband cigarettes to smoke shops in New York by providing false reports to Missouri, thus defrauding New York State of tax revenue.

E.     Based on the above facts, your affiant believes that the conspirators agreed to use the cover of HCI to deliver cigarettes to smoke shops in New York State or elsewhere under the color of what is often referred to as nation-to-nation shipments.  HCI already openly distributes tribal produced cigarettes and tobacco to businesses located on other Indian nations and tribes.   HCI can easily conceal the contraband cigarettes with the shipments they already make.

The following describes a September 15, 2011 transaction.

36.     On September 15, 2011, UC Williamson and UC Lester sold 212,400 packs (354 cases) on unstamped cigarettes to CTW.  HOFFMANN took custody of 82,800 packs (138 cases) of Marlboro and lied when he stated that he was taking them to Virginia.  The following events occurred in relation to this transaction:

*  *  *

B.     On September 16, 2011, around 8:40 a.m., surveillance personnel observed Craig SHEFFLER standing outside of the CTW warehouse.  Surveillance personnel also observed unknown individuals transferring cigarettes into a Budget truck with Oklahoma plates.  At

6

approximately 9:10 a.m., surveillance personnel observed HOFFMANN leave the CTW parking lot driving the Budget truck. At approximately 9:30 a.m., surveillance personnel observed HOFFMANN arrive at a nearby 7-11 and meet with TADAIYON. … During a subsequent vehicle stop, Trooper Carnagey identified HOFFMANN as the driver and TADAIYON as the passenger. Carnagey was shown documentation for the load of cigarettes which included a bill of lading …. The bill of lading … listed the carrier as being Wolf's Run. …

\* \* \*

E.      CTW invoiced BNC with number 9693 on September 14, 2011. CTW invoice 9693 was for 54,000 packs (90 cases) of Marlboro and 28,800 packs (48 cases) of Newport, which corresponds with the load picked up by HOFFMANN at the ATF UC warehouse. These 138 cases had already been sold through SCTC to Totem Pole and Wolf's Run. In addition to the wires, the emails show that SCTC sold part of this cigarette load to PARRY.

F.      Based on the analysis of records as summarized above, your affiant believes that subjects of the investigation brokered, facilitated, promoted, and concealed the sale of contraband cigarettes to smoke shops in New York State, including Totem Pole and Wolf's Run, by providing false reports to Missouri. Wolf's Run shipped the cigarettes and failed to obey the prepay tax system set up by New York State, thus defrauding New York State of tax revenue. …

\* \* \*

Description of an October 13, 2011, transaction.

38.      On October 13, 2011, ATF Special Agents Matt Wilson, Harry Lett, Randy Roberts and Kansas City, Missouri Police Department Detective Chad Herriman established surveillance around the ATF UC warehouse in Kansas City, Missouri. At approximately 12:10 p.m., surveillance crews witnessed a small white box truck arrive and park in front of the UC warehouse. From previous surveillances conducted, this particular vehicle was known to be used by CTW when purchasing contraband cigarettes. At approximately 12:21 p.m., a U-Haul truck bearing Arizona license plates and a white Penske truck bearing Indiana license plates arrived at the UC warehouse. The Penske vehicle was later determined to be driven by Piotr HOFFMANN and the U-Haul was driven by Mark BISHOP. Then at approximately 12:35 p.m., Nicole SHEFFLER (Craig SHEFFLER's wife) arrived at the UC warehouse. At approximately 12:41 p.m., Craig SHEFFLER arrived at the UC warehouse. UC Williamson sold 258 cases of Marlboro cigarettes and 96 cases of Newport to CTW. Craig SHEFFLER paid

7

$638,240.00 in U.S. Currency for the cigarettes and wrote a check for the balance of $10,000.00. The check was written on CTW's bank account.

      A.    At approximately 12:53 p.m., HOFFMANN left the UC warehouse driving the white Penske truck. HOFFMANN drove to the Holiday Inn Express Hotel, 1995 Macon Street, North Kansas City, Missouri, arriving at approximately 1:03 p.m., and parked the vehicle in front of the hotel. HOFFMANN met with William PARRY in the parking lot of the hotel. PARRY took a bag out of a 2012 grey Jeep vehicle with Illinois license plates and put it into the white Penske truck. PARRY got into the driver's seat of the white Penske truck and drove away. HOFFMANN stayed at the hotel with the Jeep vehicle. PARRY got onto the interstate and began driving south on Interstate 35 then turned eastbound on Interstate 70.

\* \* \*

      C.    Surveillance followed the truck to the Terra Haute, Indiana area where surveillance was terminated per ATF Special Agent Teddy Horton. The vehicle was last seen continuing eastbound on Interstate 70.

      D.    On October 14, 2011, ATF SA Wilson spoke with ATF Special Agent Steve Dickey, New York Field Division, who advised that law enforcement conducted surveillance of Wolf's Run located in Irving, New York. ATF Special Agent Robert Wilson, U.S. Border Patrol Agents Larry Jay, Phillip Knapp and William Farnham were all present during this surveillance.

      E.    SA Dickey observed the white Penske truck arrive at Wolf's Run at approximately 8:31 a.m. SA Dickey was able to confirm it was the same vehicle via the license plate and truck number previously provided by Agent Wilson. SA Dickey observed the vehicle pulled to the right side of the rear building after entering the Wolf's Run parking lot at 1412 Route 438, Irving, New York 14081. At approximately 8:38 a.m., Border Patrol Agents Jay and Knapp watched the truck pull up to the rear of the building near the garage door, the garage door opened and the vehicle started backing inside. At approximately 8:39 a.m., Border Patrol Agent Farnham observed the garage door closing and the truck parked inside the building. Once the vehicle was inside the building, the agents saw no further activity and terminated the surveillance.

<u>Description of a December 16, 2011, transaction.</u>

39.    On December 08, 2011, UC Williamson telephoned William PARRY at the telephone number of 716-319-8568. During the call, PARRY said

8

that he was back in New York. UC Williamson told PARRY that UC Williamson would be coming up the following week. UC Williamson read off PARRY's order and agreed to double it from the earlier request. UC Williamson told PARRY that UC Williamson needed cash and they agreed on pricing. PARRY provided the address of 1412 Route 438, Irving, New York 14081 (the location of Wolf's Run) for the delivery.

A.  On December 16, 2011, at approximately 10:48 a.m., ATF UC's Williamson and Labno drove to 1412 Route 438, Irving, NY 14081, Wolf's Run. UC Williamson drove to the gas pump area near the convenience store/smoke shop at this address and briefly met with PARRY. PARRY directed Agents to a garage in the rear of this property and assisted UC Williamson in backing his box truck into the garage.

B.  Once inside the garage, UC Williamson opened the rear door of the box truck and showed PARRY the load consisting of 110 master cases (66,000 cigarettes) of unstamped Marlboro cigarettes and 30 master cases (18,000 cigarettes) of Newport cigarettes. PARRY advised Agents, "I got some guys who can help [unpack the truck]." PARRY indicated that he would go and get the cash to pay for these cigarettes and agents observed PARRY exit the far end of the garage through a double door which lead to an attached single-family residence.

C.  At this time, UC Labno observed numerous large plastic tubs sitting on several metal shelving units arranged against the walls of the garage. UC Labno noted that many of these tubs appeared to contain paper records, and that many of the tubs were also labeled—for example "2009 register receipts" or "2009 Store Records."

D.  Agents observed PARRY re-enter the garage from the attached single-family residence carrying a brown cardboard box containing a large amount of United States currency. Agents then observed PARRY issue instructions to a male employee who PARRY addressed as "MoMo;" PARRY instructed this worker to find another employee and begin unloading the cigarettes from the agents' truck.

E.  PARRY then set up a folding table and began removing bundles of currency from the cardboard box he had brought from the residence and began piling them on the table. PARRY told agents that "lot of these are in straps of ten [thousand]." The agents then set up an electronic money counter and counted the currency provided by PARRY; the total amount of currency provided to agents by PARRY was counted as $265,800.00.

\* \* \*

9

H.    As the agents walked with PARRY back to their box truck UC Williamson asked PARRY when he would be ready to purchase more cigarettes. PARRY responded, "I'll give you a call—we'll try to get rid of these as quickly as we can." UC Williamson then advised PARRY that he was shutting down his cigarette operation until January and PARRY acknowledged this schedule.

I.    At approximately 12:08 p.m., agents exited the garage and drove to the Wolf's Run gas pumps. A short time later, PARRY walked over to agents as they fueled their vehicles. … In response to UC Williamson's questions, PARRY pointed to the above described single-family residence attached to the garage and stated, "Yeah, that's one place I live." PARRY then advised that he owned another residence in Arizona.

\*  \*  \*

## ONGOING INVESTIGATION

Phone Conversation/Ordering of Contraband Cigarettes by PARRY July-August 2012.

40.    On July 26, 2012, SA Williamson—while still working in an undercover capacity in the Western District of Missouri, Kansas City, Jackson County, Missouri—received a telephone call from PARRY. SA Williamson requested to call PARRY back.

41.    SA Williamson then called PARRY at the telephone number of (716) 319-8568. During the telephone call, PARRY informed SA Williamson that he (PARRY) needed to get more product, referring to unstamped cigarettes. SA Williamson informed PARRY that SA Williamson only had Marlboro and Newport cigarettes.

42.    PARRY stated that he wanted the cigarettes delivered like last time. Specifically, in order to ensure that no one witnessed the delivery, PARRY would have the truck pull into his warehouse Wolf's Run, which is located at 1412 Route 438, Irving, New York 14081 (also known as 12795 4 Mile Level Road), and which is described in attachments 1 and 2.

43.    SA Williamson offered to allow PARRY to come pick up the cigarettes and provided a price. SA Williamson told PARRY that the price was due to the cigarettes being found "on the side of the road," implying that they were stolen. Based on this statement, as well as their prior dealings, I believe PARRY understood and knew the cigarettes to be unstamped and stolen.

44.    SA Williamson requested PARRY call and inform SA Williamson

what PARRY wanted to do.

45.    Starting on August 1, 2012, PARRY, utilizing the telephone number of (716) 319-8568, began exchanging text messages with SA Williamson (who was then located in the Western District of Missouri) to arrange the delivery of the unstamped cigarettes.  During the exchange, PARRY explained that he wanted the cigarettes delivered to him and PARRY provided an order for 168 master cases of cigarettes (2,016,000 cigarettes).  The order totaled $358,560.00 which PARRY agreed to pay in cash on delivery.

46.    On September 11, 2012, SA Williamson called PARRY at the telephone number of (716) 319-8568.  During the telephone call, SA Williamson offered to provide PARRY with additional cigarettes.  SA Williamson informed PARRY that the additional cigarettes would be delivered and would need to be paid for at a later date.  SA Williamson referenced these cigarettes as having "fallen off a truck" (stolen) and would be able to provide reduced price for these cigarettes.

*   *   *

48.    PARRY and SA Williamson arranged for the delivery to occur on September 26, 2012, at PARRY's business, Wolf's Run, which is located at 1412 Route 438, Irving, New York, 14081 (also known as 12795 4 Mile Level Road). Based on the conversations and prior dealings, it is understood that the delivery is to be made to the warehouse/residential structure described in attachments 1 and 2.  These cigarettes have been shipped from Kansas City, Missouri, Jackson County, Western District of Missouri and transported in interstate commerce to New York State.  As part of the deal, PARRY would pay the agents $358,560.00 cash for the cigarettes.  It is anticipated that ATF undercover agents, together with members of the ATF search team, will, during the controlled delivery of the cigarettes to Wolf's Run, execute this search warrant prior to the completion of the undercover transaction.  PARRY does not have the necessary New York State wholesalers tobacco license nor does he report receiving cigarettes to New York State.  He is also not a state licensed stamping agent.  Therefore, I believe PARRY is in violation of 18 U.S.C. § 2342(a) (receiving/possession of contraband cigarettes as defined in 18 U.S.C. § 2341(2)).  Additionally, PARRY, through the use of a telephone, arranged the purchasing and receiving of stolen properly through interstate commerce, making him, I believe, in violation of 18 U.S.C. §§ 659, 1343 and 1349.

*   *   *

52.    The offenses described in this affidavit are associated with persons and businesses that routinely keep records in paper, digital, and electronic forms. Individuals involved in fraud schemes, money laundering and CCTA violations

maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding outbuildings; … the places in which they conduct their business; or in storage areas. Regulations require that distributors of cigarettes maintain the required records for a term of three years. According to [Alcohol and Tobacco Tax and Trade Bureau] and persons/entities in the industry the normal business practice for retention of records in the industry is even longer – a period of seven years. Based on the facts set forth in this affidavit it is believed that probable cause exist[s] that records, fruits, instrumentalities, and evidence of a crime pertaining to the alleged offenses are maintained at the location owned or occupied by the conspirators detailed in Attachments 1 and 2, which is incorporated and made a part of the affidavit.

\* \* \*

(Application for a Search Warrant (docs #198-1 and 217-1))(footnote omitted)

## III. DISCUSSION

Defendant Parry seeks "suppression of all evidence and fruits of the search based upon an impermissible warrant." (Motion to Suppress (doc #198) at 5) In support of the motion, defendant argues: (1) the search warrant issued was not supported by probable cause; (2) the search warrant issued was not seeking relevant or probative evidence; (3) the search warrant applied for and issued was defective and was overly broad and constituted an impermissible general warrant; and (4) the search warrant was stale. The Court will address each of defendant's arguments.

### A. Probable Cause

In support of his argument that the search warrant was invalid because it was not supported by probable cause, defendant Parry contends that: (1) in the transactions referenced where Parry and Wolf's Run allegedly provided the transportation for contraband cigarettes, there was no information provided in the affidavit to suggest that Parry knew of the nature of the shipments he was transporting, thus, Parry was merely a common carrier; and (2) in the

12

transactions referenced where Parry allegedly received contraband cigarettes, Parry's possession of the cigarettes on his sovereign territory did not violate New York State tax laws, as possession on his property is not possession within New York State. Further, defendant Parry contends that the application alleges no basis for the tracking devices that were placed on the rental trucks and that these devices were planted without probable cause. Finally, defendant Parry contends that the application for the search warrant was not incorporated by reference into the warrant and, as a result, there was no probable cause upon which to issue the warrant.

The Eighth Circuit Court of Appeals has set forth the following with respect to probable cause in a search warrant:

> "Probable cause to issue a search warrant exists when an affidavit ... in support of the warrant sets forth sufficient facts to establish that there is a 'fair probability that contraband or evidence of' criminal activity will be found in the particular place to be searched." United States v. Davis, 471 F.3d 938, 946 (8th Cir. 2006)(quoting Illinois v. Gates, 462 U.S. 213, 238 ... (1983)). The determination of probable cause is made after considering the totality of the circumstances. United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir. 2007). After a judge has issued a search warrant upon a finding of probable cause, "that finding deserves great deference." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998)(citing Gates, 462 U.S. at 236 ...). Thus, when reviewing the sufficiency of the ... affidavit supporting a search warrant that was found by the issuing judge to provide probable cause, we give great deference to the issuing judge's finding. Id.

United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007).

Reviewing courts should not make a de novo determination of probable cause. Instead, the decision to issue a search warrant is to be upheld if supported by a substantial basis in the record. See Illinois v. Gates, 462 U.S. 213, 238-39 (1983). Deference should be given to determinations of probable cause by issuing judges. As stated by the Supreme Court in Gates:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him,

13

... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for ... concluding that probable cause existed.

462 U.S. at 238-39.

On September 25, 2012, United States Magistrate Judge H. Kenneth Schroeder, Jr., a magistrate judge with the United States District Court for the Western District of New York, was presented with the following facts: from April to October, 2011, William F. Parry and his business, Wolf's Run, were involved in shipping loads of contraband cigarettes from an undercover operation in Kansas City, Missouri to various destinations, including Parry's own business, Wolf's Run, at 1412 Route 438, Irving, New York 14081 (also known as 12795 4 Mile Level Road); in December 2011, Parry purchased contraband cigarettes directly from the undercover agents in Kansas City, Missouri, and had them delivered to his garage/warehouse at 1412 Route 438, Irving, New York 14081 (also known as 12795 4 Mile Level Road); to pay for the contraband cigarettes delivered on December 16, 2011, Parry went to his attached residence and obtained a brown cardboard box containing a large amount of United States currency from which he counted out $265,800.00; during the December 16, 2011 transaction, agents observed numerous large plastic tubs sitting on several metal shelving units arranged against the walls of the garage/warehouse that were labeled as containing paper records; on July 26, 2012, Parry called the undercover agent in Kansas City, Missouri to obtain more contraband cigarettes and requested delivery "like last time" to his garage/warehouse at 1412 Route 438, Irving, New York 14081 (also known as 12795 4 Mile Level Road); this delivery was arranged to take place on September 26, 2012 (the day following the application for the search warrant), at Parry's business, Wolf's Run; and Parry had agreed to pay $358,560.00 in cash for the contraband

14

cigarettes. During the controlled delivery of the contraband cigarettes on September 26, 2012, the agents anticipated executing the search warrant.

Given the facts presented to the issuing judge, this Court finds that Magistrate Judge Schroeder had a substantial basis for concluding that probable cause existed that contraband or evidence of violations of 18 U.S.C. §§ 371 (conspiracy), 659 (interstate transportation of stolen property), 1341 and 1343 (mail and wire fraud), 1956 and 1957 (money laundering) and 2342 and 2343 (Contraband Cigarette Trafficking Act) would be found within the garage/warehouse and attached residence at Wolf's Run, 1412 Route 438, Irving, New York 14081.

B.     Alleged Deficiencies in the Affidavit

The remainder of defendant's probable cause argument alleges deficiencies in the affidavit given in support of the search warrant. The Court will briefly discuss each of these alleged deficiencies.

While defendant Parry contends that the transactions referenced where he merely shipped contraband cigarettes could not provide probable cause because there was no information provided that Parry knew what was contained within the shipments, the Court finds that this argument is contradicted by the affidavit. For example, as set forth in the April 14 and 15 transaction, Parry's employee, Tornabene, told UC Williamson that this was the ninth or tenth deal that Parry had done with Tadaiyon and that in the other deals, Parry was the recipient of the cigarettes. Further, Parry was in the process of getting money into an account to purchase the contraband cigarettes in the April 14 and 15 transaction if Tadaiyon's financing did not come through. However, even if it were true that Parry did not know what was contained within the shipments he merely transported (which the Court does not believe to be the case based on the

15

information contained within the affidavit), there were other transactions where Parry is alleged to have ordered and received contraband cigarettes at Wolf's Run. These transactions certainly provide sufficient probable cause to support the issuance of the warrant.

While defendant Parry contends that the transactions referenced where he allegedly received contraband cigarettes at Wolf's Run could not provide probable cause because his possession of the cigarettes on his sovereign territory did not violate New York State tax laws, the Court has found that the New York state cigarette taxing scheme is applicable to defendant on the Cattaraugus Indian Reservation. (See doc #259 at 9-10) While defendant Parry contends that the application alleges no basis for the tracking devices that were placed on the rental trucks and that these devices were planted without probable cause, the Court finds the facts set forth above, from which the Court excluded the information obtained from the tracking devices, sufficient to support probable cause.

Finally, while defendant Parry contends that the application for the search warrant was not incorporated by reference into the warrant, the Search and Seizure Warrant states: "An application by a federal law enforcement officer … requests the search of [Wolf's Run] …" and "I find that the affidavit(s) … establish probable cause to search and seize the … property." (Docs #198-1 at 1 and #217-2 at 1) Attachments 1 (a detailed description of the property to be searched), 2 (photographs of the property to be searched) and 3 (items to be seized) to the Application for a Search Warrant were also attachments to the Search and Seizure Warrant. (See Doc #198-1 at 39-42; Doc #217-1 at 38-41; Doc #217-2 at 2-5)

C.    Scope of the Warrant

Defendant Parry argues that the search warrant issued was not seeking relevant or

16

probative evidence and that it was overly broad and constituted an impermissible general warrant. In support of this argument, Parry contends that financial documents should not have been included in the items to be seized:

> [A]s possession by Mr. Parry on his property of untaxed cigarettes does not constitute a New York State tax and in turn a CCTA violation, there was no probable cause that the property observed at the transaction (and referenced to be searched within the application) would contain evidence of any records, fruits or instrumentalities of any prior crime—specifically, bookkeeping records and other financial records, currency, shipping records, loan records, receipts, invoices, statements and locked containers capable of holding bulk cash.

(Motion to Suppress (doc #198) at 17)  Again, the Court has found that the New York state cigarette taxing scheme is applicable to defendant on the Cattaraugus Indian Reservation.  (See doc #259 at 9-10)  Thus, the search for financial records of a business that was shown to be involved in both the transportation and receipt of contraband cigarettes appears proper.

Defendant also argues that the search of his residence was improper as the affidavit referred to operations of his business occurring within the "warehouse type structure." (Motion to Suppress (doc #198) at 18)  As set forth above, the affidavit also alleges that Parry retrieved the cash to pay for the contraband cigarettes from his attached residence.  (See Affidavit at ¶ 39(B) and (D))  Further, the affidavit notes that in the affiant's experience, individuals involved in fraud schemes, money laundering and CCTA violations maintain documents relating to their illegal activities for long periods of time and that these documents are routinely secreted within their residences.  (See Affidavit at ¶ 52)

Defendant Parry further argues that he operated both a retail operation as well as a fuel transport operation out of the Wolf's Run location and that the stored records which were observed by the undercover agents related to those businesses and, thus, there was no indication

17

that boxes within the warehouse contained evidence of a crime. The Court finds that probable cause existed to believe that evidence of a crime would be found in the place to be searched. Officers were entitled to search for documents that evidenced the commission of a crime by defendant Parry.

With respect to defendant's argument that the warrant was overly broad, the Court notes that the constitutional standard for particularity of description in a search warrant is met if "the description is sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the ... objects to be seized." United States v. Coppage, 635 F.2d 683, 686-87 (8th Cir. 1980)(citing Steele v. United States, 267 U.S. 498, 503-04 (1925)). "'The degree of specificity required will depend on the circumstances of the case and on the type of items involved.' [United States v. Horn, 187 F.3d 781, 788 (8th Cir. 1999).] The particularity requirement 'is a standard of 'practical accuracy' rather than a hypertechnical one.' United States v. Peters, 92 F.3d 768, 769-70 (8th Cir. 1996)." United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007), cert. denied, 552 U.S. 1104 (2008). With respect to a case involving fraud, the Eighth Circuit Court of Appeals has provided the following further guidance on the standard necessary for particularity:

> We have recognized that fraud cases present unique particularity problems. We have stated that "a search warrant involving a scheme to defraud is sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit." United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992)(quotation and citation omitted). As a result, we have recognized a permeated-fraud exception that allows the government to seize almost every record of a business when evidence shows that fraud in the business was pervasive; in United States v. Kail, we explained:
>
> > While the search warrant in this case was broad in the sense that it allowed inspectors to seize almost all of the business records of Coin & Stamp

Gallery, we would conclude that under the particular facts of this case the scope of the warrant was justified. This is because it would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation. We would therefore affirm the district court's finding that the warrant was sufficiently particular.

804 F.2d 441, 445 (8th Cir. 1986). …

United States v. Sigillito, 759 F.3d 913, 924 (8th Cir. 2014), cert. denied, 2015 WL 133494 (Jan. 12, 2015).

Attachment 3 to the affidavit and search warrant sets forth the items to be seized as follows:

Unstamped/improperly stamped cigarettes

All bookkeeping records and other financial records including General Ledger, General Journals, all Subsidiary Ledgers and Journals, Gross Receipts and income records, Cash Receipts and Disbursement records and/or Journals, sales and Purchase records and/or Journals, Accounts Receivable and Payable Ledgers and records, Bad Debt records, Cost of Goods Sold records, Loan Receivable and Payable Ledgers, Voucher Register and all sales and expense invoices including all invoices documenting expenses paid by cash (currency) or bank check (cashier or teller checks) and retained copies of any bank checks (cashier or teller checks.)

Items of the crime such as US currency.

All shipping records including Bill of Ladings, shipping instructions, logs, and invoices.

All financial statements, bookkeeper's and/or accountant's workpapers used in the preparation of business records or tax returns. Retained copies of all federal and state income, payroll, monthly cigarette returns or reports and excise tax returns.

All bank account records including bank statements, deposit slips, records revealing the identity of checks drawn on the account, checks deposited, all debit and credit memos, and all wire transfers.

All financial records reflecting investments in stocks, bonds, mutual funds, overseas accounts, and other business ventures.

19

> All loan records including applications, financial statements, loan collateral, credit and background investigations required, loan agreements, notes or mortgages, settlement sheets, contracts, retained copies of checks issued for loans, repayment records, including records revealing the date, amount and method of repayment (cash or check), checks used to repay loans and a record disclosing the total amount of discount or interest paid annually, records of any liens, loans correspondence files and internal memoranda relative to these loans.
>
> Appointment books, diaries, or calendars containing appointments with cigarette manufactures, distributors, retail stores, smoke shops, and individuals.
>
> Receipt books, invoices, statements, journals and ledgers showing customer billings and payments.
>
> Locked containers capable of holding bulk cash, such as safes or lock boxes.

(Doc #198-1 at 42; Doc #217-1 at 41; Doc #217-2 at 5)  While this Court may have required language that tied the documents to the sale and transportation of cigarettes and put some date restrictions on the documents, given the circumstances of this case, the Court finds the warrant sufficiently particular with regard to the items to be seized.

     D.    <u>Staleness of Information</u>

Finally, defendant Parry argues that "[a]s the alleged December 16, 2011 sale took place nine months prior to the application and execution of the warrant, and no criminal transactions took place between the December 16 transaction and the issuance of the September 25, 2012 warrant, the warrant was stale."  (Motion to Suppress (doc #198) at 21)

Contrary to defendant's argument, the facts before Magistrate Judge Schroeder clearly show that criminal transactions took place between the December 16, 2011 transaction and the issuance of the September 25, 2012 warrant.  Specifically, on July 26, 2012, Parry called the undercover agent in Kansas City, Missouri to obtain more contraband cigarettes and requested delivery "like last time" to his garage/warehouse at 1412 Route 438, Irving, New York 14081

Case 4:13-cr-00291-BCW   Document 271   Filed 01/20/15   Page 20 of 23

(also known as 12795 4 Mile Level Road); this delivery was arranged to take place on September 26, 2012 (the day following the application for the search warrant), at Parry's business, Wolf's Run; and Parry had agreed to pay $358,560.00 in cash for the contraband cigarettes. During the controlled delivery of the contraband cigarettes on September 26, 2012, the agents anticipated executing the search warrant. Where "the affidavit 'describes a continuing pattern of behavior,' and the older information corroborated more current reports linking the address to illegal activity, the affidavit was not stale 'when taken as a whole.'" United States v. Garcia-Hernandez, 682 F.3d 767, 772 (8th Cir. 2012)(quoting United States v. Palega, 556 F.3d 709, 715 (8th Cir. 2009)). The facts provided in support of probable cause were not stale.

     E.     The Leon Good Faith Exception

Even if probable cause did not exist for the warrant at issue (which this Court does not believe to be the case), the Leon good faith exception would support the admissibility of the evidence seized pursuant to the warrant since it appears that the officers executing the warrant were acting in "objectively reasonable reliance" on a warrant issued by a neutral judge. See United States v. Leon, 468 U.S. 897, 922 (1984); United States v. Murphy, 69 F.3d 237, 241 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996).

The Eighth Circuit has set forth the following with respect to exceptions to good faith reliance:

> Ordinarily, a police officer cannot be expected to question a judge's probable cause determination. Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth. Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause.

Murphy, 69 F.3d at 241 (quoting United States v. Gibson, 928 F.2d 250, 253-54 (8th Cir. 1991)).

Stated another way, there are four "exceptions" wherein reliance upon an invalid search warrant is per se unreasonable: (1) the affiant misled the judge by including information in the affidavit that the affiant knew was false or would have known was false, except for a reckless disregard for the truth; (2) no reasonably well-trained officer could rely on the warrant, as it was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (3) the judge wholly abandoned his neutral and detached position and acted as a rubber stamp; or (4) the warrant itself is so facially defective that the executing officer cannot presume its validity. See United States v. Leon, 468 U.S. 897, 922-23 (1984). The "exceptions" to good faith reliance do not apply in this case.

While defendant Parry contends that "in light of the agent's actions in securing the warrant,[3] the good faith exception should not apply," the information before the Court does not suggest any improprieties on the part of the agents. See United States v. Hasan, 718 F.3d 338, 344 (4th Cir. 2013)("the mere fact that ATF sold untaxed cigarettes does not render their investigation outrageous").

---

[3]Defendant Parry sets forth the following as the actions of the agents:

> At the time the warrant was issued, the agents were aware … that Mr. Parry was not a party that had been engaged in receiving cigarettes directly from the undercover warehouse, thereby knowing that they were allegedly taxable "contraband." Further, that the agents initiated the transaction and never told Mr. Parry that the shipment was "contraband" cigarettes. The agents orchestrated and took part in the untaxed cigarette scheme from day one. From providing to delivering the alleged contraband cigarettes to the parties referenced in the affidavit—including Parry.

(Motion to Suppress (doc #198) at 15)

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Parry's Motion to Suppress (doc #198).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.


_____ */s/ Sarah W. Hays* _____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE